**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JESSICA M.B.,**

        **Plaintiff,**

    **v.**                    **Civil Action 2:24−cv−4219**
                                  **Judge Edmund A. Sargus**
                                  **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Jessica M.B., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The Undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 12) and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

On January 6, 2020, Plaintiff protectively filed an application for DIB alleging disability beginning June 30, 2019, due to a back injury, anxiety, and panic attacks. (R. at 560−61, 592). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on July 8, 2021. (R. at 53−72). The ALJ denied Plaintiff's application in a written decision on August 2, 2021. (R. at 33−52).

After the Appeals Council denied review, Plaintiff filed a case in the United States District Court for the Southern District of Ohio. This Court remanded the case to the Commissioner. *See [Jessica M.B.] v. Comm'r of Soc. Sec.*, No. 2:22−cv−3367 (S.D. Ohio May 1, 2023); (R. at 1110−21). This matter was remanded by the Appeals Council on October 13, 2023. (R. at

1122−26).  Upon remand, ALJ Jeannine Lesperance held a subsequent hearing via telephone on May 15, 2024 (R. at 1051−82), and issued a decision denying Plaintiff's application for benefits. (R. at 1019−50).

Plaintiff did not request review by the Appeals Council, opting instead to file suit with this Court on December 2, 2024 (Doc. 1), and the Commissioner filed the administrative record on January 29, 2025 (Doc. 7).  The matter is ripe for consideration.  (Docs. 12, 13, 14).

### A.    Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's statement to the agency as follows:

Specifically, in March 2020, [Plaintiff] thoroughly completed a function  report alleging difficulty completing tasks, concentrating, handling stress, and handling changes in routine, but also reporting that she lived with her husband in a trailer, made scrambled eggs while sitting, grocery shopped once a month, spent time with others, used Facebook, received visits from a friend 3 times a week who gave her a massage, watched movies, attended church (now watched on YouTube), got along with authority figures, and was able to count change, handle a savings account, and use a checkbook (5F).

(R. at 1026).

[Plaintiff] alleged a back injury, anxiety, panic attacks, use of a back brace, inability to drive because of pain, inability to extend her lower extremities, irritability, need for help with personal care, increased public anxiety, and difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, stairclimbing, completing tasks, concentrating, handling stress, and handling changes in routine (2E/2; 5E; 7E; and 9E), but she also reported that she lived with her husband in a trailer, made scrambled eggs while sitting, grocery shopped once a month, spent time with others, used Facebook, received visits from a friend 3 times a week who gave her a massage, watched movies, attended church (now watched on YouTube), got along with authority figures, had no medication side effects, and was able to count change, handle a savings account, and use a checkbook (5F). She reported that she was five feet, six inches tall, and weighed 154 pounds (2E/2).

(R. at 1028).

The ALJ also summarized Plaintiff's hearing testimony from the July 8, 2021, hearing:

*** [Plaintiff] testified she was disabled from back pain.  She said that her doctor suggested lumbar fusion surgery, but she thought that might break down her back

even more. She said that she wanted to hold off on surgery given her young age. She said that she obtained a second opinion suggesting that she start physical therapy again and that she had had had six sessions without any progress, so was released a few weeks prior to the hearing. She said that sitting was difficult for her. She said that she could sit for half an hour before having "excruciating" pain. She said that she did not drive, and when she drove, her hip popped out and caused sciatic pain. She said that her back was unstable and that a cane and a handicap placard were prescribed. She said that she started having falls and difficulty balancing, so the cane was to help with her balance when she walked. She said that she could walk 1,000 feet outside with a cane.

(R. at 1028−29).

The ALJ summarized Plaintiff's hearing testimony from the May 15, 2024, hearing:

*** [Plaintiff] testified that she graduated high school, attended some college, lived with her retired husband on a five−acre farm, sometimes drove to the grocery store and medical appointments, and had obtained a nurse aid certification. She said that her back condition had worsened and that she had not worked on the farm in two years, when she was making at most $200 to $250 a month. She said that her husband took care of the farm and greenhouse now. She acknowledged that in February 2023 she could go square dancing at a community center but said was no longer able to do that. She said that she had visitation with her children by phone or at their father's. She said that she used a cane and back brace when her balance was off, which happened often. She said that she was no longer seeing a rheumatologist. She said that, on a daily basis, she dressed with her husband's assistance most days, cooked breakfast with her husband, tried to wash the dishes, took a nap, walked and checked on her husband outside, started lunch, lay down for a little bit, watched YouTube, used Facebook, or talked on the phone to her children, ate dinner, relaxed with a movie, and lay back down. She said that she was doing a lot more in the summer of 2023 with respect to creating content for YouTube but still was engaged in activities somewhat, though she was unable to complete the OSU master gardening program. She said that she had fibromyalgia that affected her wrists, fingers, and up her arm, which prevented her from lifting things when it flared up. She said that she had difficulty gripping and holding on to things. She said that she had migraines two to four times a month that kept her down for days at a time and caused nausea, but she was not yet receiving treatment for them. She said that she had to elevate her legs for 30 to 60 minutes. She said that she could safely lift a half gallon of liquid. She said that she had difficulty reaching over head. She said that her mental health had worsened over the past three years. She said that she had a panic attack in front of a nurse practitioner when receiving antibiotics for Lyme disease, resulting in uncontrollable shaking in her legs and jaw. She said that she had about three panic attacks a month. She said that she had no memory issues but did have impaired concentration. She said that she did not have issues getting along with others. She said that she had erratic sleep and low energy.

3

(R. at 1029).

## B.    Relevant Medical Evidence

The ALJ summarized Plaintiff's medical records and symptoms as to her physical impairment

as follows:

> The record documents [Plaintiff]'s lumbar spine condition as the primary physical
> complaint. Well prior to the alleged disability onset date, there is a remote history
> of lumbar discectomy in 2017 with significant improvement as noted in follow up
> through early 2018 (1F/3−4). In early 2019, she returned, complaining of 10 days
> of pain into both legs with numbness, which resolved, but left some low back pain
> (1F/7). Her exam findings were normal, including normal strength and sensation
> in the lower extremities, and she was not taking any prescription medication,
> eschewing those for naturopathic remedies and refusing physical therapy (1F/8).
> She was maintaining a healthy lifestyle and was active, with her neurosurgeon
> suggesting that she temporarily limit lifting at work and then gradually increase it
> (1F//9).
>
> Although [Plaintiff] alleges an onset of disability in June 2019, there are no further
> visits documented for her lumbar spine condition until October 2019, when she
> asked her primary care physician for a letter stating that she "can't work much" due
> to her back pain, which she wanted to use in relation to a child support dispute
> (1F/19 and 8F/29−32). In January 2020, she reported that her back pain was
> urgently worse after a "sneeze" the Friday prior (8F/38), but lumbosacral spine
> x−rays revealed interval development of only mild L4−5 disc interspace narrowing
> (18F/315). At this time her primary care nurse practitioner, Sarah Dorsky, indicated
> that she "appears well" and was "in no distress" and in "no acute distress," with
> normal gait and station (2F/5−6 and 8F). In follow up with primary care in
> February 2020 her gait was "stiff" though she still appeared well and in no distress
> despite reporting pain at a level of 9 on a 10−point scale (2F/8−9), and later that
> month she also appeared well and in no distress but also walked with a "hunched"
> gait and was "obviously uncomfortable," which is internally inconsistent.
>
> In early 2020, [Plaintiff] engaged in physical therapy (9F), and a physical therapist
> found "significant instability" about the hips, pelvis, and low back, and believed
> there was some atrophy in the trunk (9F/18) with movements at times guarded and
> apprehensive (9F/30). At times she walked with an antalgic gait but used no
> assistive devices (9F/36). She had some slight weakness at 4− to 4+/5 (9F/2). She
> engaged in physical therapy until March 2020 (9F/49) (later, when she returned in
> November, she reported she had "gotten much better" with this round of therapy
> but then the pain came back as soon as she stopped doing her home exercise
> program (see 9F/51)). A March 2020 MRI of her lumbar spine showed prior
> surgical changes, possibly a retained disc fragment at L4−5 that appeared to

compress the thecal sac (but not the cord), and annular bulge at L5−S1 concentric to the left (18F/316).

In April and June 2020, [Plaintiff] was evaluated by neurosurgery, but she was using homeopathic remedies and did not want any medications, as well as declining the offer of another surgery (3F/1−11). She followed up with Ms. Dorsky in July and August 2020, both times wanting notes to support her court case related to child support, but both dates she appeared well and in no distress (5F.). Ms. Dorsky noted in August that [Plaintiff]'s feet were discolored after sitting less than 5 minutes but improved with lying down (5F/3). July exam results were entirely normal, except for a comment suggesting she was overweight, though she had a body mass index (BMI) of only 25.43 (5F/6).

In August 2020, Ellen Offutt, MD, performed an independent consultative exam and reported substantially normal findings except for [Plaintiff] being "a little tender" over the lower lumbar spine and right sacroiliac (SI) joint, and limited range of motion in the context of "very poor effort" (4F/4−6). [Plaintiff] appeared "slightly uncomfortable" in the supine position but that "disappeared quickly when distracted." The exam specifically found normal findings with respect to gait, following simple commands and instructions, speech, skin (no discoloration), atrophy (none, though there were slight difference on the right and left), and strength, with no evidence of spasm. Cerebellar function (coordination) was intact, sensation was preserved, and she could walk on her heels and toes, tandem walk, stand on each foot, and squat without difficulty. Dr. Offutt concluded: "Her physical exam did not match her stated complaints" (4F/4). Lumbar spine x−rays did reveal multilevel degenerative changes, most pronounced at L4−L5 and L5−S1 levels (4F/10).

In October and November 2020, [Plaintiff] saw a naturopath (7F) and reported that her activities included bible study, church, farming, animals, YouTube, and couponing (7F/1). She went to a church revival the night before and had pain but hid it from others (7F/2). She also reported that she raised piglets and did castration for others (7F/5). She reported fairly new symptoms of social anxiety and anxiety when driving (7F/5). She reported that she "shops for deals" and it takes 3−5 hours for several stores, using a "stroller" sometimes; she was out shopping for 4 hours the day before (9F/25−26). She reported that her partner observed she could be agitated, mean, and grumpy with him (9F/25). In November 2020, she followed up with primary care and her exam findings were normal (8F/21). In December 2020, she asked for a cane because she "feels as if she would fall" when walking and she reported that physical therapy recommended this for "instability" (8F/17−19). The cane was prescribed, as well as a handicap placard (8F/19). As with other exams by Ms. Dorsky, [Plaintiff] appeared well and was in no distress, but also walked with a hunched gait (8F/18). In late November 2020, she returned to physical therapy, and her strength was better than in the earlier part of the year but still showed mild weakness at 4 to 4+ (9F/52). She was seen four times through

December 2020 and reported some improvement but with ongoing symptoms (9F/59−62).

In May 2021, [Plaintiff] saw Ms. Dorsky again and indicated her insurance had run out for physical therapy but that she had it back, and she now complained of widespread pain and expressed her belief that she might have fibromyalgia (14F/3). However, Ms. Dorsky's exam revealed normal findings other than "general tenderness," and [Plaintiff] was referred to rheumatology and sent back to physical therapy. In May and June 2021, [Plaintiff] did more physical therapy and reported that she was a "homesteader" who lived with her husband and could potentially be doing a lot of work around their property (16F/2). Her gait at intake was antalgic using a cane (16F/3). She complained of neuropathic pain in her hands and toes and all over her left arm. Motor strength was slightly diminished at 4/5 in the legs. Range of motion was limited. In follow up, she reported worse pain after she "jarred her back" attempting to get onto her lawn mower (16F/19) and a fall on her driveway after getting a rock stuck under her "flip flop" (16F/33). She did six sessions without significant change other than slightly improved strength (15F/49−50).

In June 2021, [Plaintiff] saw rheumatology and exam findings were normal other than some tenderness; she had normal range of motion (15F/6). Tender points were noted in six areas bilaterally, but she had no tenderness in the axial spine (a requirement to meet the tender point test for fibromyalgia under SSR 12−2p) (15F/7). Blood work was done, but there was no follow up or rheumatological diagnosis offered. She returned to primary care, where her exam findings were normal except for some tenderness, and a cane was noted (17F/3). At her request, she was referred to pain management (17F/9). A July 2021 MRI of the SI joints showed normal SI joints and moderate degenerative findings in the lumbar spine (18F/326).

In October 2021, [Plaintiff] presented to pain management and reported an allergic "reaction" to prednisone (19F/7), though this is not established objectively anywhere in the record. She was taking medication from her primary care provider (Naprosyn, Flexeril, and Norco) (19F/7).

Exam findings were normal except for some tenderness, a positive right straight leg raise, pain−limited range of motion, and noted use of a cane (19F/8). Some provocative testing was also positive. However, she had full strength and sensation in both legs. Her mood, behavior, and judgment were normal (19F/8). She was "not interested" in injections (19F/7). The pain management provider offered to trial other medications and recommended more physical therapy and a transcutaneous electrical nerve stimulator (TENS) unit (19F/9).

In July 2022, [Plaintiff] presented to primary care, and Andrew Seipel, MD, noted that his nurse practitioner had been prescribing pain medication (23F/21). Exam findings were normal and Dr. Seipel specifically noted that [Plaintiff] was sitting

cross−legged on the exam table (23F/22). He provided a letter to support renewing a handicap placard. In October 2022, she followed up with him for medication refills and reported doing some yoga and walking most days, sometimes 30 minutes or less if her pain was worse (23F/12). Exam findings were normal, and she was not using a cane, and was sitting cross legged again. He provided a note that she could not work for six months, apparently related to her application for some county benefits (23F/5).

In September 2023, [Plaintiff] presented to establish care with a new primary care provider (24F/34). Exam findings were normal except her gait was noted to be abnormal because she was using a cane. In April 2024, she was seen for Lyme disease, which had been confirmed by bloodwork, but exam findings were completely normal other than the "bullseye rash" from the tick bite, and her mood, behavior, thought content, and judgment were normal, as well as neurological findings, which were non focal and with normal range of motion (24F/7−8).

(R. at 1030−32).

The ALJ further summarized Plaintiff's medical records and symptoms as to her mental health impairments. (R. at 1034−35).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2024, and has not engaged in substantial gainful activity since June 30, 2019, the alleged onset date. (R. at 1024). The ALJ determined that Plaintiff has severe impairments: degenerative disc disease of the lumbar spine, anxiety, post-traumatic stress disorder (PTSD), and depression. (R. at 1025). Still, the ALJ found that Plaintiff's impairments, either singly or in combination, do not meet or medically equal a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand, walk, or balance four hours in an eight−hour workday; occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; and occasionally stoop, kneel, and crouch, but never crawl. She must not work at unprotected heights. She can perform simple tasks without a production rate pace such as an assembly line or with high production quotas. She can interact occasionally with others. She can deal with occasional changes.

7

(R. at 1028).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (R. at 1029).

Relying on the vocational expert's testimony, the ALJ found that, considering her age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform at the light exertional level, such as a marker, routing clerk, and checker I.  (R. at 1041−42).  She therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 30, 2019, through the date of this decision (20 CFR 404.1520(g))."  (R. at 1042).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court."  *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)).  If the Commissioner's decision is supported by substantial evidence,

it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.   DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ violated 20 C.F.R. § 404.1520c during her evaluation of the medical source opinions of certified nurse practitioner, Sarah Dorsky, APRN−CNP by failing to evaluate her opinion for supportability and consistency. (Doc. 12 at 9–16). The Commissioner counters that the ALJ properly considered the record and found Nurse Dorsky's opinion unpersuasive in accordance with the appropriate regulations. (Doc. 13 at 5−14). For the reasons that follow, the Undersigned finds Plaintiff's assignment of error is without merit.

A plaintiff's RFC "is defined as the most [she] can still do despite the physical and mental limitations resulting from [her] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1545(a)(1). The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 404.1513(a)(1)–(5). For medical opinions, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must weigh the opinion with various factors in mind. See 20 C.F.R. § 404.1520c(c)(1)–(5). Among them, supportability and consistency are the most

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (*see* § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

important, and the ALJ must explain how they were considered.  20 C.F.R. § 404.1520c(b)(2)
(noting the ALJ may discuss the other factors but is not required to do so).

When evaluating supportability, the more relevant the objective medical evidence and
supporting explanations presented by a medical source are to support the medical opinion, the
more persuasive the ALJ should find the medical opinion.  20 C.F.R. § 416.920c(c)(1).  When
evaluating consistency, the more consistent a medical opinion is with the evidence from other
medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the
medical opinion.  20 C.F.R. § 404.1520c(c)(2).  But the ALJ does not need to use "any specific
phrasing to comply with the applicable regulations."  *Elizabeth A. v. Comm'r of Soc. Sec.*, No.
2:22-cv-2313, 2023 WL 5924414, at *4 (S.D. Ohio Sept. 12, 2023) (noting that "the appropriate
level of articulation will necessarily depend on the unique circumstances of each claim" (internal
quotation omitted)).  Instead, the ALJ's role is to articulate how she considered medical opinions
and how persuasive she found the medical opinions to be.  *See Holston v. Saul*, No.
1:20−CV−1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021) (citing 20 CFR
§ 404.1520c(b)(1)−(3)), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL
1863256 (N.D. Ohio May 10, 2021).  The Court's role is not to reweigh the evidence, but to make
sure the ALJ considered the proper factors and supported her conclusion with substantial evidence.
*Id.* at *14.

In May 2021, Nurse Dorsky completed a primary care medical statement in which she
noted Plaintiff's diagnosis as lumbar disc herniation with narrowing disc space and her symptoms
as burning, stabbing, shooting back pain, disturbed gait, and right leg pain.  (R. at 913).  For
Plaintiff's prognosis, Nurse Dorsky noted: "only treatment is surgical, without surgery[,] pain will
continue, surgery is not a fix either."  (*Id.*).  She identified clinical findings and objective signs as:

"MRI with large disc herniation at L4−5" and "obvious discomfort with walking, sitting, and standing." (*Id.*).  Nurse Dorsky opined that Plaintiff could sit, stand, or walk for less than 2 hours with at least hourly breaks of 15 minutes due to chronic fatigue, pain, paresthesias, or numbness; could never lift weight greater than 10 pounds; could rarely twist, stoop, crouch, squat, or climb stairs or ladders.  (R. at 913−14).  She felt Plaintiff would likely be off−task for 25% of the typical workday; and would miss more than four days per month.  (R. at 914).  She concluded that Plaintiff's limitations apply as of July 19, 2017.  (*Id.*).

Upon review, the ALJ found Nurse Dorsky's opinion "unpersuasive."  (R. at 1037).  She explained:

> I considered the form completed by Ms. Dorsky (11F).  This was the basis of the district court remand.  On the form, Ms. Dorky restates the claimant's subjective symptoms and her diagnosis.  She indicates the "only treatment is surgical," which is inconsistent with the record, including several bouts of physical therapy with at least some benefit, as well as her most recent pain management visit indicating there were other medications and modalities that could be used, but the claimant declined or did not follow up.  Ms. Dorsky indicated on May 18, 2021, the date this form was signed, that her exams showed "obvious discomfort with walking sitting, standing."  However, as discussed above, while she observed abnormal gait at some visits, particularly in 2020, at other visits the claimant's exam findings were normal.  Also, Ms. Dorsky repeatedly indicated the claimant was well appearing, in no distress, and in no acute distress, despite also, at times, indicating abnormal gait.  She did not record in her exams that the claimant appeared uncomfortable when sitting.  Other than the recitation of symptoms and noted observation of abnormal gait, this form is very poorly supported, as most of the selections are not explained, nor does she cite to specific evidence.  For example, she does not explain why the claimant could sit, stand, or walk less than two hours each, need a break for 15 minutes every hour, never lift anything, "rarely" perform postural activities, and be off task 25% of the day.  Moreover, she endorses that these limits go back to July 2017, and apparently was unaware of the claimant's work activity after her prior surgery, as a certified nurse assistant, which would have required lifting at the medium level and being on her feet most of the day.  She also appears to be unaware of the claimant's varied and significant daily activities, including working on a homestead farm, raising turkeys, chickens and piglets, performing castration services, gardening, canning, square dancing, cooking, and performing other activities, all of which require some ability both to be on one's feet and to lift and carry objects.  Ms. Dorsky's exams offer poor support for her selections as well.  Although, as noted by the Magistrate Judge, she has observed an abnormal gait at

times (but other times no abnormalities), and this is consistent with some of the physical therapy records, it is inconsistent with her presentation at the independent consultative exam of Dr. Offutt (4F) and to several of her treating doctors, who did not observe an abnormal gait. Moreover, her rather scant exams did not include other findings such as range of motion, strength, reflexes, and sensation, which might have (or might not have) provided some explanation for her gait abnormalities. As I noted above, while MRI results were abnormal, the findings were not read to be neurocompressive, nor do exams show loss of sensation or pain in a radicular or dermatomal pattern. The claimant's straight leg findings throughout the record are variably normal or abnormal at different degrees. For these reasons, I find Ms. Dorsky's opinions not persuasive, as they are neither fully supported nor fully consistent with the record. To the extent that she relied on the claimant's subjective reports, these also do not provide strong support for Ms. Dorsky's opinions, for the same reasons that I have identified above as to why they are not fully consistent with the evidence of record. I did consider Ms. Dorsky's observations of the claimant's gait, among other evidence, in finding the claimant somewhat more limited that the State Agency and much more than Dr. Offutt, though they are experts in our program. Her opinions were not completely disregarded but cannot be adopted as written.

(R. at 1037–38).

According to Plaintiff, this analysis inadequately addresses the supportability and consistency of Nurse Dorsky's opinion. (Doc 12 at 16). Plaintiff concedes that the ALJ "did consider both factors," but she finds the ALJ's analysis wanting. (Doc. 12 at 16). For the reasons discussed below, the Undersigned finds that the ALJ did enough.

### A. Supportability

Plaintiff argues that the ALJ violated 20 CFR 404 § 1520c(c)(1) because, "at the very least," the ALJ inadequately discussed the supportability of Nurse Dorsky's opinion. (Doc. 14 at 2; Doc. 12 at 16). The Undersigned disagrees.

Supportability requires the ALJ to evaluate how much the medical conclusions are supported internally, as well as by other treatment notes and exams by the opining physician. 20 CFR 404 § 1520c(c)(1); *Michael R. v. Comm'r of Soc. Sec.*, No. 2:22-CV-4117, 2023 WL 6160626, at *5 (S.D. Ohio Sept. 21, 2023) ("The ALJ properly evaluated the supportability of Ms.

Riffle's opinion given the lack of objective evidence in the opinion itself and when compared to Ms. Riffle's past treatment notes."), *report and recommendation adopted*, No. 2:22-CV-4117 WL 688754 (S.D. Ohio Feb. 20, 2024); *see also Thomas J. v. Comm'r of Soc. Sec.*, No. 1:24-CV-00048, 2024 WL 3841221, at *10 (S.D. Ohio Aug. 15, 2024). This is exactly what the ALJ did.

First, the ALJ measured the amount of support Nurse Dorsky's opinion offers itself. The ALJ reasoned, "other than the recitation of symptoms and noted observation of abnormal gait, this form is very poorly supported, as most of the selections are not explained, nor does she cite to specific evidence." (R. at 1037 (citing R. at 913)). For instance, the ALJ found that Nurse Dorsky did not explain why Plaintiff "could sit, stand or walk less than two hours each, need a break for 15 minutes every hour, never lift anything, 'rarely' perform postural activities, and be off task 25% of the day." (*Id.* (citing R. at 913)). Plaintiff takes issue with this example and incorrectly claims the ALJ found that Nurse Dorsky offered no explanation at all. (Doc. 13 at 13; Doc. 14 at 3–4 (citing R. at 1037); R. at 1037 (citing R. at 913)). But that's not what the ALJ wrote. The ALJ did not base her conclusion that the form was "very poorly supported" solely on the one example. Instead, the ALJ noted that "most" of the form lacks explanation. (R. at 1037 (citing R. at 913)). Thus, even accepting Plaintiff's contention, the ALJ still evaluated supportability by determining Nurse Dorsky did not offer sufficient explanations for her opinions. *Michael R.*, 2023 WL 6160626, at *5.

Second, the ALJ compared Nurse Dorsky's medical opinion to her prior treatment notes, finding that they "offer poor support for her selections as well." (R. at 1037 (citing R. at 913, 810, 819)). As the ALJ discussed, Nurse Dorsky indicated in her opinion that Plaintiff had "obvious discomfort with walking, sitting, standing" (*Id.* (citing R. at 913)), and some of Nurse Dorsky's prior exams found Plaintiff had an "abnormal gait" (*Id.* (citing R. at 789, 795, 798, 806, 936)).

The ALJ directly contrasted these findings (and Nurse Dorsky's opinion) with Nurse Dorsky's other findings where she indicated gait was "normal." (*Id.* (citing R. at 810, 819)). The ALJ found the variability among the exams offered poor support for Nurse Dorsky's conclusions in her report. (*Id.*; *see* R. at 1032 ("Her physical examination findings are quite variable and inconsistent, . . . comparing Ms. Dorsky's exam findings amongst themselves, some of which . . . are normal.")); *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (recognizing that the ALJ's analysis may be found throughout the decision). The ALJ also found variability within some of the exams themselves. (R. at 1031 ("In May 2021, the claimant saw Ms. Dorsky again . . . and she now complained of widespread pain and expressed her belief that she might have fibromyalgia . . . However, Ms. Dorsky's exam revealed normal findings other than 'general tenderness.'") (citing R. at 936–37); R. at 1032 ("Her physical examinations are quite variable and inconsistent, both internally (regarding Ms. Dorsky's exams, as noted above . . . ") (citing R. at 936–37))).

The ALJ further classified Nurse Dorsky's exams as "rather scant," noting that they failed to include other findings "such as range of motion, strength, reflexes, and sensation, which might have (or might not have) provided some explanation for her gait abnormalities." (R. at 1037 (citing R. at 795, 806, 830–32, 934–42)). In response, Plaintiff points to "the record" of treatment by Nurse Dorsky, which she claims offers support that the ALJ bypassed in her opinion. (Doc. 12 at 13). But the ALJ did not ignore these records; she found them unsupportive. (R. at 1037 (citing R. at 789, 795, 798, 806, 810, 819)). Plaintiff also argues that the "mere presence of 'normal' findings does not contradict Nurse Dorsky's opinions," and she claims the ALJ "failed to provide any explanation as to how a lack of distress contradicted an opinion that a claimant was limited in their ability to sit, stand, and walk." (Doc. 12 at 12 (quoting R. at 1037)). As mentioned above,

14

the ALJ explained that the medical record's oscillation between normal and abnormal findings (not just the "mere presence of 'normal' findings" or a mere absence of distress) rendered Nurse Dorsky's opinion unsupported. (*Id.*; *see e.g.*, R. at 1031–32 (citing R. at 789, 795, 798, 806, 810, 819, 936–37)). Making these determinations is precisely the ALJ's role, which the Undersigned will not reprise. 20 CFR 404 § 1520c(b)(2).

Third, the ALJ reasoned that "[t]o the extent [Nurse Dorsky] relied on the claimant's subjective reports, these also do not provide strong support for Ms. Dorsky's opinions, for the same reasons that I have identified above as to why they are not fully consistent with the evidence of the record." (R at 1038 (citing R. at 615–21)). Specifically, the ALJ considered the portion of Nurse Dorsky's opinion where she "endorses that these limits go back to July 2017" (R. at 1037 (citing R. at 913)), and she concluded they did not support Nurse Dorsky's opinion and treatment notes because, in the same timeframe, Plaintiff was working as a certified nurse assistant. (*Id.* (citing R. at 56–57, 69, 139, 593, 602, 806, 809, 829, 849, 883, 899, 1231–34, 1057)). Plaintiff was also "working on a homestead farm, raising turkeys, chickens and piglets, performing castration services, gardening, canning, square dancing, cooking, and performing other activities . . ." (*Id.* (citing R. at 62–65, 618, 743–44, 849, 1060–62)). Plaintiff nevertheless claims the ALJ ignored her subjective reports of pain. (Doc. 14 at 4). But the ALJ is not required to take subjective reports at face value when analyzing supportability. *See Mary H. v. Comm'r of Soc. Sec.*, No. 3:24-CV-00045-RGJ-CHL, 2024 WL 5485005, at *6 (W.D. Ky. Dec. 20, 2024) ("Dr. Corpus's examination does not appear to contain any specific support for the idea that Claimant was limited in her ability to walk and stand beyond Claimant's recitation of those limitations for herself, a recitation that neither the ALJ nor Dr. Corpus were required to take at face value. The [U]ndersigned finds no error in the ALJ's supportability analysis related to Dr. Corpus."), *report*

*and recommendation adopted*, No. 3:24-CV-045-RGJ-CHL, 2025 WL 903837 (W.D. Ky. Mar. 25, 2025).

The ALJ's decision and Plaintiff's Statement of Errors merely analyze the same medical history and reach opposite conclusions as to its supportability. But this alone does not negate the ALJ's well-supported determination. *See Denise Janine A. v. Comm'r of Soc. Sec.*, No. 2:22-CV-04167, 2023 WL 6939250, at *7 (S.D. Ohio Oct. 20, 2023) ("All told, the ALJ's RFC determination has substantial support; Plaintiff just disagrees with it."); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."). And, at base, whether Nurse Dorsky provided adequate support for her medical conclusions is a question explicitly reserved for the ALJ. The role of this Undersigned is to determine whether the ALJ provided an answer for that question and showed her work. *See Holston v. Saul*, No. 1:20−CV−1001, 2021 WL 1877173, at *14 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The ALJ's opinion demonstrates that she did.

Because the ALJ made clear how she arrived at her conclusion, the Undersigned finds that the ALJ has fulfilled her duty under 20 CFR 404 § 1520c(b)(2) and 20 CFR 404 § 1520c(c)(1). Accordingly, Plaintiff's assigned error is without merit.

**B.    Consistency**

Plaintiff also claims the ALJ "failed to properly analyze Nurse Dorsky's opinions with respect to" consistency. (Doc. 12 at 16). Again, the Undersigned disagrees.

Unlike supportability, which requires the ALJ to compare medical conclusions to the evidence offered by the reporting physician herself, consistency requires the ALJ to compare the

report's conclusions to the evidence offered in other sources in the record. 20 CFR 404 §1520c(c)(2); *see also David W. v. Comm'r of Soc. Sec.*, No. 3:24-CV-00255, 2025 WL 841074, at *7 (S.D. Ohio Mar. 18, 2025) ("Here, the ALJ clearly evaluated the consistency of Dr. Swedberg's opinion by comparing his findings to other medical evidence and Plaintiff's subjective accounts of his symptoms. That is all the ALJ had to do.").

Throughout her decision, the ALJ discussed why Nurse Dorsky's findings are inconsistent with the record. (R. at 1031–32, 1036–37); *see Forrest*, 591 F. App'x at 366. The ALJ specified pieces of the record that were at odds with Nurse Dorsky's opinions. For example, the ALJ found that Nurse Dorsky's conclusion that surgery is the only treatment for Plaintiff's reported pain was "inconsistent with the record, including several bouts of physical therapy with at least some benefit, as well as her most recent pain management visit indicating there were other medications and modalities that could be used, but [Plaintiff] declined or did not follow up." (R. at 1037 (citing R. at 688, 694, 696, 699, 704, 705, 711, 714, 772, 775–76, 778, 781, 785–86, 804, 806, 920, 924, 926, 928, 937, 946, 969–71, 976–78, 994, 1001, 1017)).

The ALJ also contrasted Nurse Dorsky's endorsement of Plaintiff's limitations dating back to July of 2017, with Plaintiff's work history and hobbies, of which she considered Nurse Dorsky to be "apparently . . . unaware . . . " (*Id.* (citing R. at 56–57, 62–65, 69, 139, 593, 602, 618, 743–44, 806, 809, 829, 849, 883, 899, 1057, 1060–62, 1231–34)). These activities included, in part, Plaintiff's "work activity after her prior surgery as a certified nurse assistant which would have required lifting at the medium level and being on her feet most of the day." (*Id.* (citing R. at 56–57, 69, 139, 593, 602, 806, 809, 829, 849, 883, 899, 1231–34, 1057)). They also included "working on a homestead farm, raising turkeys, chickens, and piglets, performing castration services, gardening, canning, square dancing, [and] cooking, all of which require some ability both to be on

17

one's feet and to lift and carry objects." (*Id.* (citing R. at 62–65, 618, 743–44, 849, 1060–62)).

Still more, the ALJ compared Nurse Dorsky's exams to "physical therapy records" and examination findings of other doctors and state agency consultants. (*Id.*). Specifically, the ALJ found Nurse Dorsky's observation of "abnormal gait at times" to be "consistent with some of the physical therapy records" (*Id.* (citing R. at 784–85, 850–51, 884–85, 900–01, 908–09, 977–78, 980, 1016)), but she found this observation inconsistent with Plaintiff's "presentation at the independent consultative exam of Dr. Offutt . . . and to several of her treating doctors, who did not observe an abnormal gait." (*Id.* (citing R. at 712, 925, 929)). When discussing Dr. Offut's gait findings earlier in the opinion, the ALJ reasoned, "[t]his exam happened to take place around the same time that Ms. Dorsky and the physical therapists observed some gait abnormalities, rendering the objective evidence quite inconsistent as to gait." (R. at 1036 (citing R. at 711)). And the ALJ compared Nurse Dorsky's opinions to the opinions of the state agency consultants, finding their opinions to be "not entirely consistent with the collateral record, including Ms. Dorsky's observations . . . which were available to Dr. Bertani and Dr. Hinzman at the time of their assessments . . ." (*Id.* (citing R. at 472, 476–79, 481, 483, 487–89, 492)).

As for the portion of Nurse Dorsky's opinion where she cites "MRI with large herniation at L4-5" as clinical support for Plaintiff's symptoms (R. at 913), the ALJ noted that the MRI findings (although abnormal) "were not read to be neurocompressive, nor do exams show loss of sensation or pain in a radicular or dermatomal pattern." (R. at 1037 (citing R. at 689, 695, 705, 775, 815, 896, 924–26, 932, 1007)). The ALJ even concluded that Plaintiff's "straight leg findings throughout the record are variably normal or abnormal at different degrees." (*Id.* (citing R. at 925, 929, 1638)).

Finally, the ALJ compared Nurse Dorsky's treatment notes to Plaintiff's history of using a

cane. (R. at 1034). In particular, the ALJ found that Nurse Dorsky prescribed Plaintiff a cane, not because Plaintiff's physical therapist observed "an unstable or imbalanced gait," but because Plaintiff asked Nurse Dorsky for one after her "physical therapist felt claimant had instability in her trunk." (*Id.* (citing R. at 788–90, 850, 852, 862, 864, 866, 868, 870, 904–05)). Earlier in the decision, the ALJ detailed Plaintiff's testimony at the July 2021 hearing, where Plaintiff said, "that her back was unstable and that a cane and handicap placard were prescribed. She said that she started having falls and difficulty balancing, so the cane was to help her with balance when she walked." (R. at 1029 (citing R. at 61)). The ALJ later concluded that nothing in the record (which would include Nurse Dorsky's opinion and progress notes) is consistent with the need for a cane, "for balance or otherwise." (R. at 1034 ("Her gait findings are variable, as already noted. The record does not document frequent falls.")) (citing R. at 789, 795, 798, 806, 810, 819)).

Plaintiff contends the ALJ erred when she noted the inconsistency between Nurse Dorsky's opinion that Plaintiff's "only treatment is surgical" and Plaintiff's history of other treatment such as therapy and pain management. (Doc. 12 at 11 (citing R. at 913)). According to Plaintiff, the ALJ found the record inconsistent with a "misunderstanding" of Nurse Dorsky's words instead of what Nurse Dorsky actually said. (*Id.* (citing R. at 1037); Doc. 14 at 3). On her form, Nurse Dorsky indicated Plaintiff's "only treatment is surgical, without surgery, pain will continue. Surgery is not a 'fix' either." (R. at 913). Plaintiff claims that what Nurse Dorsky meant was not that surgery was the sole treatment, but that surgery was required to relieve Plaintiff's pain (although not completely), and that this statement (not the ALJ's reading) is supported by the record. (Doc. 12 at 11).

Plaintiff again asks the Undersigned to step into the ALJ's shoes. This time, she wants the Undersigned to find that the record is consistent with Plaintiff's interpretation of Nurse Dorsky's

opinion.  And again, Plaintiff forgets that the Undersigned's proper inquiry is to determine whether the ALJ analyzed consistency at all.  *See Holston*, 2021 WL 1877173, at *14.  As demonstrated above, the ALJ did precisely that.  The ALJ did not base the entirety of her analysis upon Nurse Dorsky's singular prognosis, but rather she thoroughly and thoughtfully compared Nurse Dorsky's opinion and treatment notes with much of the record.  The ALJ completed the consistency analysis as required by 20 CFR 404 § 1520c(b)(2) and 20 CFR  404 §1520c(c)(2), and Plaintiff's assigned error is without merit.

*****

It is worth noting once more that Plaintiff concedes the ALJ "did consider both factors . . ." (Doc. 12 at 16).  In the same sentence, Plaintiff urges the Undersigned to find that the ALJ's analysis of Nurse Dorsky's opinion was improper "with respect to those factors."  (*Id.*).  This, the Undersigned cannot do.  The propriety of the ALJ's analysis is determined by the presence of the ALJ's consideration of supportability and consistency.  *See Holston*, 2021 WL 1877173, at *14. It is not determined by Plaintiff's desire for the analyses to yield different results.  Because the Undersigned has found that the ALJ sufficiently discussed both factors, Plaintiff's assignments of error are without merit.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 12) and **AFFIRM** the Commissioner's decision.


Date:   September 19, 2025                         /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).